Kelly R. LEWIS, Monroe
County Controller

v.

MONROE COUNTY, and its Board of Commissioners, Janet Weidensaul, Gregory Christine, and James Cadue, in their official capacities as Commissioners of Monroe County, Appellants.

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 15, 1999.

Decided Sept. 3, 1999.

John B. Dunn, Stroudsburg, for appellants.

Jonathan Mark, Stroudsburg, for appellee.

Before SMITH, J., FRIEDMAN, J., and KELLEY, J.

FRIEDMAN, Judge. [1]

Monroe County and its Board of Commissioners (Commissioners) appeal from that portion of an order of the Court of Common Pleas of Monroe County (trial court) directing that the Monroe County Controller, Kelly R. Lewis, (Lewis or Controller) receive a salary review report prepared for the Commissioners by David M. Griffith and Associates, Ltd.[2] (Griffith Report).

Monroe County (County) is a fifth class county governed by three elected commissioners.[3] The County's three Commissioners along with the Controller constitute permanent members of the County's salary board[4] (Salary Board). Section 1622 of the County Code,[5] 16 P.S. § 1622. The Salary Board fixes the compensation of appointed County officers and sets the number and compensation of County employees. Sections 1620 and 1623 of the County Code, 16 P.S. §§ 1620 and 1623.[6] The Salary Board is to meet at the beginning of January of every year to set salaries, revising them as necessary. Section 1624 of the County Code, 16 P.S. § 1624.[7]

In addition to their statutory membership on the Salary Board, the Commissioners and the Controller have other responsibilities set forth in the County Code. Under section 1701 of the County Code, 16 P.S. § 1701, the Commissioners are designated as the responsible managers and administrators of the fiscal affairs of the County.[8] One of the Commissioners' management obligations is to prepare and ad-

1. Although originally scheduled for argument on April 15, 1999, an Application for Post-Submission Communication pursuant to Pa. R.A.P. 2501(b), and response thereto, was granted by order dated May 14, 1999. The Communication was filed on May 25, 1999 and the response was filed on June 4, 1999. Therefore, the record in this case was not considered complete until June 4, 1999.

2. By merger, the firm is now DMG Maximus.

3. Janet Weidensaul, Gregory Christine and James Cadue are the County's elected Commissioners.

4. In addition, individual County department heads temporarily sit as a fifth member of the Salary Board when the positions and salaries of the employees in their departments are in question. Section 1625 of the County Code, 16 P.S. § 1625.

5. Act of August 9, 1955, P.L. 323, *as amended*, 16 P.S. § 1622.

6. Section 1620 of the County Code provides in relevant part that: "The salaries and compensation of all appointed officers and employes who are paid from the county treasury shall be fixed by the salary board created by this act for such purposes."

Section 1623 of the County Code provides in relevant part that:

The [salary] board, subject to limitations imposed by law, shall fix the compensation of all appointed county officers, and the number and compensation of all deputies, assistants, clerks and other persons whose compensation is paid out of the county treasury (except employes of county officers who are paid by fees and not by salary), and of all court criers, tipstaves and other court employes, and of all officers, clerks, stenographers and employes appointed by the judges of any court and who are paid from the county treasury. . . .

7. The salary board is required to meet and organize on the first Monday of January of each year. 16 P.S. § 1622. At each annual meeting, the salary board revises the salary schedule as it deems necessary. In addition, the salary board may meet between annual meetings to reconsider salaries when such action is required. 16 P.S. § 1624.

8. The Controller's duties do not overlap those of the Commissioners. Section 1702(a), describing the functions of the Controller, provides in relevant part:

*Subject to the power and duty of the county commissioners to manage and administer the fiscal affairs of the county,* the controller shall supervise the fiscal affairs of the county, including the accounts and official acts relating thereto of all officers or other per-

vertise a proposed budget, and to adopt a final budget, by December 31st of each year.[9]

On December 24, 1997, the County, through the Commissioners, contracted with the consulting firm of David M. Griffith and Associates, Ltd. (Griffith) to conduct a salary study and issue a report of its findings "to assist the County in developing a comprehensive employee classification and pay plan for all positions excluding elected officials." (Agreement to Provide Professional Consulting Services to Monroe County, Pennsylvania, R.R. at 182.) The salary study was undertaken in an effort to address attrition in the ranks of County employees believed to have resulted from below market salaries. In order to conduct the study, Griffith prepared an extensive survey/questionnaire that each County employee was required to complete; certain employees were interviewed as well. The study was to compare employee salary levels in the County with salaries in other jurisdictions and organizations, selected by the Commissioners, to determine whether County employees were being paid fairly and, thus, assist the Commissioners in making appropriate budgetary allocations for those salaries for

fiscal year 1999.[10] (R.R. at 111–13, 146, 150–51.)

Although expected earlier, it was not until October 19, 1998 that Griffith provided the Commissioners with the Griffith Report, a first draft of the salary study results. The Commissioners took no action based upon the Griffith Report at that time. Rather, the Commissioners met with Griffith on two occasions to ask questions regarding the Griffith Report, and a third meeting was scheduled for November 12, 1998 so that Griffith could provide answers to those questions. (R.R. at 126–31.) Awaiting those answers, the Commissioners had made no final decision about what use they would make of the Griffith Report in the 1999 budget, nor had the Commissioners made any decisions regarding any County employee salaries with reference to the Griffith Report. (R.R. at 120, 136–38.)

Before the Commissioners received the Griffith Report, the Controller, on two occasions, inquired about the status of the salary study; however, the Commissioners ignored these requests. (R.R. at 155, 176–77.) Then, on October 28, 1998, the Controller wrote to formally request production of the Griffith Report, claiming a right to the Griffith Report "under the Right To

---

sons who shall collect, receive, hold or disburse the public moneys of the county. *The discretionary powers of the controller shall not be applicable to the management of the fiscal policies of the county commissioners....*

16 P.S. § 1702(a). (Emphasis added.)

9. The Commissioners must begin preparation for the succeeding fiscal year's proposed budget at least thirty days prior to adopting the budget. Section 1781(a) of the County Code, 16 P.S. § 1781(a). Further, the proposed budget must be made available for public inspection no later than twenty days prior to the date set for adopting the budget at year's end. Section 1782(a) of the County Code, 16 P.S. § 1782(a). Upon adopting the budget, the Commissioners must adopt appropriation measures required to put the budget into effect and fix the tax rate so as to raise a sum sufficient to meet budgetary needs. Section 1783 of the County Code, 16 P.S. § 1783. However, the Commissioners may, at any time, by resolution, make supplemental ap-

propriations for any lawful purpose from any available funds not otherwise appropriated; the Commissioners may also transfer any unencumbered balance of another appropriation item. Section 1784 of the County Code, 16 P.S. § 1784.

10. During the 1998 budget process, there had been several discussions about surplus funds expected by the County at the end of 1997, centering on the possible use of those funds to pay salary increases if the Griffith Report indicated that was needed and the Commissioners agreed to it. Because the funds were available, it was determined that there was no need to wait until the Griffith Report and the 1999 budget year before raising salaries. Ultimately, the Commissioners used the surplus to provide a 4% across-the-board pay increase to County employees in 1998, to help them until the Griffith Report was completed. (R.R. at 119–20, 147–48, 151–52.)

Know Act, the County Code, including 16 P.S. section 406, and the Statutory provisions relating to the respective duties, powers, authority, and obligations of the Controller and Commissioners." (R.R. at 186–87.) On November 4, 1988, the Commissioners sent a letter denying the Controller's request. Citing relevant case law, the Commissioners explained that the Controller had no right to the Griffith Report under either the Right to Know Act,[11] or section 406 of the County Code, 16 P.S. § 406, because the Griffith Report was neither a public record, as defined in section 1(2) of the Right to Know Act, 65 P.S. § 66.1(2), nor a fiscal record subject to taxpayer inspection under the County Code.[12] Further, the Commissioners suggested that, if they were to make use of the Griffith Report in the 1999 budget to fix the personal or property rights of any person, the document would then become a public record, and the Commissioners certainly would provide the Controller with a copy at that time. (R.R. at 188–90.)

On November 6, 1998, the Controller filed a Petition for Inspection of Records and Documents pursuant to section 406(b) of the County Code, 16 P.S. § 406(b), or in the alternative, a Statutory Right to Know Act Appeal under section 4 of the Right to Know Act, 65 P.S. § 66.4, (Petition/Appeal), requesting that the Commissioners provide him with a copy of the Griffith Report. (R.R. at 5–10.) The trial court scheduled a hearing on the matter for November 12, 1998. Prior to that date, the Controller served upon the Commissioners various subpoenas to produce documents at the hearing. On November 12, 1998, immediately before the hearing, the Commissioners filed an answer to the Controller's Petition/Appeal, a motion to dismiss the Controller's Petition/Appeal and a motion to quash the subpoenas. The trial court dealt with the motion to quash,[13] but then proceeded to hear testimony from Lewis and from Commissioner Gregory Christine[14] without formally ruling on the motion to dismiss. Following the hearing, the parties submitted briefs in support of their respective positions.

In a November 19, 1998 opinion, the trial court expressly held that, because the Commissioners had made no decision whether to use the Griffith Report in the 1999 budget: (1) the Griffith Report was not a public document under the Right to Know Act, (Trial ct. op. at 13–19, R.R. at 205–11); and (2) the Griffith Report was not a fiscal record subject to public inspection under the County Code. (Trial ct. op. at 19–22, R.R. at 211–14.) Accordingly, the trial court denied production of the Griffith Report on either of the grounds specifically pled by Lewis in the Petition/Appeal.[15] Notwithstanding this denial, the trial court held that Lewis was to receive the Griffith Report. In doing so,

11. Act of June 21, 1957, P.L. 390, *as amended,* 65 P.S. §§ 66.1–66.4.

12. Section 2 of the Right to Know Act provides that every "public record" of an agency shall, at reasonable times, be open for examination and inspection by any citizen of the Commonwealth. 65 P.S. § 66.2. Section 406(a) of the County Code provides for the inspection of "fiscal records" by any County taxpayer, subject to reasonable rules and regulations respecting the time of such inspection. 16 P.S. § 406(a).

13. With respect to the motion to quash the subpoenas, the Commissioners pointed out that one of the documents subpoenaed was the Griffith Report itself, which was the subject matter of the dispute in the case. The

trial court resolved this problem by making the Griffith Report a part of the record but sealing it and keeping it until after a final determination was made. (R.R. at 90–91.)

14. Lewis' attorney called Commissioner Christine to testify as a witness as if on cross-examination. The Commissioners presented no direct testimony at the November 12, 1998 hearing.

15. We note that the Controller does not challenge the trial court's determination that the Griffith Report is neither a public record subject to disclosure to citizens under the Right to Know Act nor a fiscal record subject to disclosure to taxpayers under section 406 of the County Code. We agree with the trial court's analysis in this portion of its opinion.

the trial court stated that "inherent in [the Controller's] cause of action is the argument that as a statutory member of the [S]alary [B]oard he is entitled to receive a copy of the ... Griffith Report." (Trial ct. op. at 10, R.R. at 202.) The trial court acknowledged that Lewis did not set forth this cause of action or plead it as clearly as he might have; however, the trial court concluded that the Controller's Petition/Appeal, "when read and scrutinized in its entirety, raises this issue and [the Commissioners], in recognition of this, have sought to address [it]." (Trial ct op. at 10 n. 13, R.R. at 202.) Accordingly, applying Pa.R.C.P. No. 126,[16] the trial court chose to disregard any procedural defect and consider the "cause of action."

The trial court noted that the function of the Salary Board is to set the salaries of County employees, with the purpose of acting as a watchdog agency over the County Commissioners. *See Cadue v. Moore*, 166 Pa.Cmwlth. 450, 646 A.2d 683 (1994); *Penksa v. Holtzman*, 153 Pa. Cmwlth. 94, 620 A.2d 632 (1993). Thus, the trial court determined that Lewis, in order to carry out his responsibilities as a member of the Salary Board, needed to review more than the 1999 budgetary form; he also must be permitted to examine the Griffith Report which "clearly provides the basis of the figures used by ... [the] Commissioners to fix the [C]ounty employees' wages." (Trial ct. op. at 11, R.R. at 203.) The trial court went on to say that there simply was no legitimate reason for the Commissioners to deny this essential information to a statutory co-equal member of the Salary Board because to do so would destroy his role as watchdog over the Commissioners. Moreover, the trial court concluded that Lewis was entitled to the Griffith Report because allowing the Commissioners to fix salaries for 1999 in setting up the budget would preclude Lewis from performing his statutory duties, effectively making the salaries a *fait accompli* without any input from the Salary Board. Based on this analysis, the trial court held that Lewis was to receive the Griffith Report. The Commissioners now appeal to this court.[17]

Before we consider the merits of the appeal, however, we must first address the issue of mootness. In a footnote in his brief, the Controller suggests that the Commissioners' appeal has been mooted by subsequent public disclosure of the Griffith Report.[18] That footnote states that:

From subsequent events, it appears that the Commissioners' appeal is or may be moot. During the 1999 budget process the Commissioners released the Salary report to Lewis and the public. A budget was ultimately adopted. Thereafter, errors were found in the report. The consultant revised the report. After the revised report was received by the County and discussed with officials salaries were established for 1999. Despite

---

16. Pa.R.C.P. No. 126 provides for the liberal construction and application of rules when necessary to secure the just, speedy and inexpensive determination of actions. To that end, courts are permitted to disregard any procedural error or defect which does not affect the substantial rights of the parties.

17. The Commissioners filed their appeal less than an hour after the trial court rendered its decision. In addition, on December 1, 1998, the Commissioners filed a Statement of Matters Complained of on Appeal Pursuant to Pa.R.A.P.1925(b), following which, the trial court issued a Statement Pursuant to Pa. R.A.P.1925(a) addressing the matters raised by the Commissioners.

18. We note that the Commissioners, in their brief, never acknowledged releasing the Griffith Report, nor did the Commissioners file a reply brief addressing the question of mootness raised by the Controller. However, in an Application Pursuant to Pa.R.A.P. 2501(a) and (b), the Commissioners requested, inter alia, the opportunity to provide their position on the issue of mootness. In an order dated May 14, 1999, this court granted the Commissioners' request and directed the Commissioners to submit a memorandum or letter addressing that issue, allowing for a response by the Controller.

these events and the apparent disclosure of the report that is the subject of this case the Commissioners have continued this appeal. If the report under seal has been disclosed, this appeal is moot. At the very least to the extent any errors claimed by the Commissioners are found to have any merit, they are harmless.

We recognize that disclosure of the Griffith Report,[19] adoption of the 1999 budget and setting of salaries for 1999 has rendered this particular controversy moot. However, courts will review such matters when the issue raised is one of important public interest, capable of repetition unless settled and apt to elude review. *Jersey Shore Area School District v. Jersey Shore Education Association*, 519 Pa. 398, 548 A.2d 1202 (1988); *Consumer Education and Protective Assoc. (CEPA) v. Southeastern Pennsylvania Transportation Authority (SEPTA)*, 125 Pa.Cmwlth. 143, 557 A.2d 1123 (1989). We see this as such a case.

Here, the Controller sought production of the Griffith Report, containing information which in the course of events was likely to become a public record subject to full disclosure. At issue is whether the Controller, while as yet without rights to the Griffith Report as a member of the public under the Right to Know Act or section 406 of the County Code, nevertheless had a need to know, and a right to demand, the information in the Griffith Report based upon his status as Controller and Salary Board member.

The trial court has resolved that issue in the affirmative and, absent reversal on

appeal, that decision will remain law in the County. Thus, it is predictable that in the future, the Controller, in his role as a Salary Board member or as a member of another County Board, will seek disclosure of other information gathered by the Commissioners which, although it ultimately may prove relevant to the Commissioners' decision making, is as yet preliminary and not acted upon. In that event, the circumstances existing here likely will be repeated. That is, due to the limited time period between the request for the information and subsequent appropriate public disclosure of the information, the issue currently in dispute will be pursued through litigation in the trial court and yet become technically "moot" before the disposition of any appeal to this court.[20] We have permitted review of cases where, as here, the question raised is likely to arise again but circumstances afford insufficient time for appellate review before the matter is mooted by the lack of an available remedy. *See e.g., Gaffney v. City of Philadelphia*, 728 A.2d 1049 (Pa.Cmwlth.1999).

Moreover, we believe the matter at issue is of great public interest because it goes to the essence of the power and authority of the Controller to demand, and the duty of the Commissioners to supply, non-public information. In view of the decision of the trial court, it is likely that such requests for other nonpublic information will be made by Lewis and others in the future, not based on rights of the public to public documents or on any express statutory right of the requesting party but based on the belief of the requesting party that the documents are a necessary aid to job per-

---

**19.** We note that, although Lewis acknowledges release of a salary report to the public, it appears that Lewis' entitlement to the Griffith Report, as it existed at the time of his Petition/Appeal, remains in dispute between the parties. Apparently dissatisfied with the documents provided by the Commissioners, Lewis has continued to pursue disclosure of the actual Griffith Report, currently still under seal with the trial court. (Appendix "A" to Commissioners' Memorandum submitted pursuant to this court's May 14, 1999 order.) Further, Lewis suggests that beyond the Grif-

fith Report, there are similar documents which were not, but ought to be, disclosed. *Id.*

**20.** In this case, less than two months elapsed between the Controller's request for the Griffith Report and the Commissioners' public release of the information in that Report, clearly illustrating that, in similar cases, the time will be too short to permit appellate review.

formance. Because the issue of whether certain documents are subject to disclosure for the reasons and on the grounds stated by the trial court is an issue of great public importance that is capable of repetition and likely to evade review, it falls within the exceptions to the general rule calling for dismissal, so that this court is free to decide the Commissioners' appeal.

■ On appeal,[21] the Commissioners argue that the trial court erred in directing them to provide the Controller with a copy of the Griffith Report.[22] We agree. The trial court correctly determined that, unless and until the Commissioners made use of the Griffith Report in setting the 1999 budget, that Report was not subject to public disclosure under the Right to Know Act or the County Code. Consequently, the trial court denied production of the Griffith Report to Lewis on those grounds. Then, eschewing this reasoning, the trial court held that the Controller must receive the Griffith Report *before* the Commissioners decide what, if any, use they will make of the Report so that the Controller can perform his duties as a statutory member of the County's Salary Board. In so holding, the trial court displays a misunderstanding of the Salary Board's statutory duties and the case law interpreting the respective roles of the Commissioners and the Salary Board.

The trial court deemed it self-evident that, because the Salary Board sets salaries, the Commissioners should not be allowed to keep essential information from a Salary Board member of equal standing. The trial court premised this determination on the belief that the Salary Board needed to set wages *before* the Commissioners could set a budget, so that the Commissioners could incorporate those salary decisions into the budget. It is in adopting this premise that the trial court goes astray. An examination of the relevant provisions of the County Code, as well as applicable case law, make clear that the legislature intended a different chronology. The Commissioners must first propose a budget, including a budget for salaries, before any meeting by the Salary Board. The Commissioners then make the proposed budget available for public inspection prior to its adoption by year's end. 16 P.S. § 1782(a). Upon adopting the budget, the Commissioners must take measures to put the budget into effect, appropriating funds or fixing the tax rate so that there will be sufficient monies to meet budgetary needs. 16 P.S. § 1783. The Salary Board, in its subsequent meeting to set salaries, must conform its salary decisions to the budget established by the Commissioners in any given year.[23] *Cadue* (holding that county

**21.** Our scope of review is limited to determining whether the trial court's findings are supported by substantial evidence, whether it has abused its discretion or committed an error of law. *Penksa.*

**22.** In summarizing their argument on appeal to this court, the Commissioners actually charge the trial court with multiple errors. First, the Commissioners contend that the trial court erred by failing to address or rule on the Commissioners' motion to dismiss the Controller's Petition/Appeal. Next, the Commissioners assert that the trial court abused its discretion and committed an error of law by invoking Pa.R.C.P. No. 126 to grant relief to the Controller on grounds not pleaded in the Petition/Appeal. The Commissioners argue that, by applying Rule 126, the trial court sua sponte allowed the Controller to plead a

third cause of action, i.e., entitlement to the Griffith Report as a statutory member of the Salary Board, without providing notice to the Commissioners. Finally, the Commissioners maintain that, even if Lewis' Petition/Appeal had included a claim of entitlement to the Griffith Report based solely on Lewis' status as Controller and statutory member of the Salary Board, the trial court erred in granting him relief on that basis. Because we agree with the Commissioners' final argument, we need not address the other arguments raised.

**23.** It is clear from Lewis' testimony at the hearing that he wanted to see the Griffith Report before the Commissioners set a proposed budget because he wanted, and felt he had the legal right, to have input on the budget *proposal* just like the Commissioners. (R.R. at 102–3, 156, 159–61.) Lewis reasoned

commissioners cannot be compelled to implement salary increases approved by the salary board where payment of those increases would overdraw the amount budgeted for salaries by the commissioners).

In *Penksa* and *Cadue,* this court recognized that there must be a proper balance of power between a county's salary board and its commissioners. In *Penksa,* noting that the salary board performs only administrative functions when it sets salaries and numbers, we determined that the salary board's power to fix the number of a new position did not invade the commissioners' legislative power to appropriate funds and levy taxes as they choose, nor did it interfere with the commissioners' general powers to make contracts for the county, to implement laws and to make appropriations for any lawful purpose. 16 P.S. § 202. We stated that the salary board is best conceived as a watchdog agency over the county commissioners, the purpose being to act as a restraining agency so that the commissioners may not have unimpeded and unrestrained power of appointment at any salary they may determine. We then concluded that the salary board's authority to create positions in the category of county employees was part of its administrative watchdog function. *Id.*

In *Cadue,* we considered an action brought by the County Commissioners seeking a declaratory judgment that they were not legally compelled to implement salary increases approved by the Salary Board where, although the department had sufficient funds in its budget to cover

the increases, payment of those increases would have overdrawn the amount the Commissioners budgeted for that department's salaries. In holding that the Commissioners could not be compelled to give the salary increases,[24] we acknowledged the function of the Salary Board and its purpose as a watchdog agency over the Commissioners. However, we concluded that the powers of the Salary Board are purely administrative and clearly limited to those listed in the County Code, i.e., setting the number of County employees and setting salaries for those employees. Because the Commissioners retain the power to budget money for County expenditures, 16 P.S. § 1781, we determined that, although the Salary Board may fix salaries, it may only do so within the amount allocated for that use by the Commissioners. We reasoned that to hold otherwise would permit the Salary Board to exceed its limited statutory powers and invade the province of the legislative body.

■ Implicit in the holding of *Cadue,* that once the Commissioners budget an amount for salaries, the Salary Board has no authority to increase salaries beyond that budgeted amount, is the principle that the Salary Board also lacks authority to set salaries prior to the Commissioners' making of the budget. To hold otherwise would force the Commissioners to appropriate funds and levy taxes in an amount sufficient to meet these predetermined salaries, legislative acts which the Commissioners cannot be compelled to perform. *Id.* The Salary Board, in the guise of

that, under the County Code, the Salary Board is not restricted to a January meeting but may meet from time to time during the year to set salaries. Lewis complained that by failing to disclose the Griffith Report, the Commissioners prevented him from doing anything with the Report until January at the earliest. (R.R. at 157.) We point out that this testimony ignores the fact that any salary decisions at a meeting held prior to the adoption of the 1999 budget would necessarily be subject to the 1998 budget, which was set without reference to the Griffith Report. Further, it ignores the period between December 11, 1998 and December 31, 1998, when the

proposed budget, and any information used in preparing that budget, is made available for review prior to the budget's adoption. No salaries will be set until the Salary Board sets them after the budget is adopted for the County.

24. However, the Controller can be compelled to approve payment of increased salaries approved by the Salary Board if the Commissioners appropriated money for this purpose. *Coleman v. Stevenson,* 20 Pa.Cmwlth. 498, 343 A.2d 375 (1975).

performing its administrative function to set salaries, cannot be permitted to make policy decisions that would exceed its limited statutory powers and invade the province of the legislative body. *Id.*

■ The Commissioners have the duty to set a budget, including a budget for salaries, for all County expenditures on an annual basis.[25] To assist them in preparing the budget, the Commissioners also have the authority to order surveys or studies with respect to any budget item, along with the discretion to use or ignore any results in making budgetary decisions. In all these capacities, the Commissioners are acting *as the Commissioners* and performing the Commissioners' duties under the County Code. No other County officer shares co-equal status with the Commissioners in fulfilling this role and, thus, only the Commissioners are entitled to participate in the formulation of a proposed budget. The Commissioners admit to a duty to make public disclosure of all documents fairly within the Right to Know Act, and they concede the need to provide any information obtained for budget making purposes to members of the Salary Board, *if*

*and when* the Commissioners determine they will use it in making salary decisions. However, the Commissioners contend that the Griffith Report does not fall within these categories, and we agree.

The uncontradicted evidence was that the Griffith Report was not a final, but a draft, report and that, as yet, it had not been used by the Commissioners in making decisions regarding employee salaries. Consequently, the Controller's demand for production of the Griffith Report was premature. The Commissioners have asserted that, were the Report final and were they to use it in fixing budget line items, they would release the Report, not only to other members of the Salary Board who would need it to fix salaries for County employees but to the general public as well. Therefore, the Controller would not be precluded from having this essential information when the time came for him to perform his duties as a member of the Salary Board.[26] Indeed, that appears to be exactly what happened as described by Lewis in his brief suggesting the matter is now moot.[27]

25. Lewis claims that the Commissioners are attempting to sidestep the full Salary Board process and set salaries through adoption of the 1999 budget, preventing the Salary Board from doing its job. As support for this contention, Lewis points to the fact that, as part of the 1999 budget process, the Commissioners asked elected officials and department heads to supply their proposed departmental or agency budgets, but, unlike past practice, the Commissioners preparation instructions stated that the form should not include salary line items. Rather, the instruction provided, "Please note that the Commissioners will establish wages for 1999. Please do not calculate increases on the form. Simply verify that the data on the form accurately reflects current approved wages." (R.R. at 180.) We are not troubled by this language. We believe that it merely recognizes the Commissioners' role in setting, not individual salaries, but the salary component of the 1999 budget, and reflects the fact that they were anticipating an across the board change in those salaries.

26. Lewis contends that denying him access to the Griffith Report in its draft form deprived him as a Salary Board member of the right and opportunity to use or consider the Report

for setting or voting to revise salaries. Similarly, according to the trial court, Lewis could not fulfill his responsibility as a member of the Salary Board without access to the draft version of the Griffith Report, reasoning that merely examining the budgetary form would be fruitless without the Report and data on which those numbers are based. What Lewis and the trial court failed to grasp is that, *if and when* the Griffith Report is used as a basis for those numbers, it will be available for Lewis' perusal and he will have an opportunity to study that information prior to voting on positions or salaries.

27. Lewis admits that during the 1999 budget process the Commissioners released a salary report to Lewis and the public and a budget was ultimately adopted. *Only after a revised report was received by the County and discussed with officials were salaries established for 1999.* This chronological sequence demonstrates that salaries were not established until after the disclosure of the report to Lewis. Thus, he was able to consult the report, as it was used to set salary budget amounts, to help him set salaries as a Salary Board member.

Based on the foregoing, we conclude that the trial court erred in determining that the Commissioners must allow Lewis access to the Griffith Report before the Commissioners have made use of the report in completing their budget proposal. Accordingly, we reverse that portion of the trial court's order directing that Lewis receive a copy of the Griffith Report.

## ORDER

AND NOW, this 3rd day of September, 1999, we reverse that portion of the order of the Court of Common Pleas of Monroe County (trial court), dated November 19, 1998, directing that Kelly R. Lewis receive the report by David M. Griffith and Associates, Ltd. in possession of the trial court in a sealed envelope.